# United States Court of Appeals for the Federal Circuit

---

**INDIAN HARBOR INSURANCE COMPANY,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5030

---

Appeal from the United States Court of Federal Claims in case no. 10-CV-680, Senior Judge Eric G. Bruggink.

---

Decided: January 11, 2013

---

SCOTT A. SCHIPMA, Winston & Strawn LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was DAVID C. ROMM.

DAVID D'ALESSANDRIS, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director.

Of counsel on the brief was JONELLE DILLEY, Trial Attorney, Navy Litigation Office, Office of the General Counsel, United States Department of Navy, of Washington, DC.

_____

Before NEWMAN, LOURIE, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Indian Harbor Insurance Company ("Indian Harbor") appeals the final judgment of the Court of Federal Claims dismissing Indian Harbor's Second Amended Complaint. In that complaint, Indian Harbor sought reimbursement under Section 330 of the National Defense Authorization Act of 1993, Pub. L. No. 102-484, Div. A, Title IU, § 330, 106 Stat. 2315, 2371 (Oct 23, 1992), amended by Pub. L. No. 103-160, Div. A, Title X, § 1002, 107 Star. 1547, 1745 (Nov. 30, 1993) ("Section 330") for environmental cleanup costs associated with the development of property formerly used as a military base. The Court of Federal Claims determined that Indian Harbor failed to identify a "claim for personal injury or property" that triggered the government's duty to indemnify under Section 330, *Indian Harbor Insurance Co. v. United States*, 100 Fed. Cl. 239, 240 (Fed. Cl. 2011) and, thus, dismissed the complaint under Rule 12(b)(6) of its rules. Because we disagree with the trial court's interpretation of the requirements of Section 330, we reverse the decision of the Court of Federal Claims and remand for proceedings in accordance with this decision.

## I.

Section 330 requires the Department of Defense to indemnify subsequent owners of former military bases against certain claims arising from environmental contamination:

(a) In general--(1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

Section 330(a)(1). The right to indemnification extends to any persons or entities that acquire ownership or control of land formerly used as a military installation. Section 330(a)(2). This includes states, state agencies, political subdivisions of a state, and any successor, assignee, transferee, lender, or lessee. *Id.* Indemnification is not available to entities who contributed to the release of the hazardous contaminants. Section 330(a)(3).

## II.

Marine Corps Air Station Tustin ("MCAS Tustin"), a military base in southern California, was scheduled for realignment and closure in 1993 pursuant to the Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687 (2000) ("Base Closure Act"). In 1992, the City of Tustin, California, was designated as the Local Redevelopment Authority tasked with preparing a plan to receive, reuse, and develop the former base. The base was official-

ly closed in 1999. The Navy, in cooperation with the United States Environmental Protection Agency, the California Environmental Protection Agency Department of Toxic Substances Control ("DTSC"), and the Santa Ana Regional Water Quality Control Board ("RWQCB"), organized an effort to investigate and clean up possible environmental contamination prior to transfer. This work culminated in a certification by the Navy that the base was suitable for transfer.

The Navy then conveyed the base, via quitclaim deed, to the City of Tustin, California on May 13, 2002. Included in the deed were covenants guaranteeing that all necessary remedial action had been or would be taken by the government. Of relevance here, the deed included specific recognition of the government's indemnification duties under Section 330: "2.7 Indemnification Regarding Transferees. The GRANTOR hereby recognizes its obligations under [Section 330]." The City of Tustin selected Tustin Legacy Community Partners, LLC ("TLCP") as the Master Developer of the acquired property and conveyed and/or leased various portions of the former MCAS Tustin property to TLCP for residential and commercial development. Prior to TLCP's acquisition of the property at issue, TLCP obtained, from Indian Harbor, insurance policy No. PEC0010756 ("TLCP Policy") providing, inter alia, coverage for certain remediation expenses incurred during development of the TLCP property.

In August 2007, while surface grading certain portions of the TLCP property, TLCP discovered total petroleum hydrocarbon ("TPH") contamination in the soil. TLCP notified the Navy of the contamination and, in September 2007, TLCP entered into a Voluntary Cleanup Agreement with the DTSC. The stated purpose of the Voluntary Cleanup Agreement was for TLCP "to obtain

the best available guidance and technical oversight from DTSC in preparing and implementing a Site Management Plan ("SMP") and, if warranted, Removal Action Work-plan(s)." J.A. 42. Six months later, the RWQCB sent TLCP a letter responding to TLCP's notification regarding petroleum contamination on the site. The RWQCB letter identified threatened contamination and stated:

> the contamination at the site must be fully characterized, and appropriate remedial action must be taken. A work plan and time schedule for conducting these activities must be submitted, in accordance with State Water Resources Control Board (SWRCB) Resolution No. 92-49.

J.A. 34. The letter explicitly recognized the ongoing involvement of the DTSC and stated that the RWQCB had "no objection to TLCP continuing the work required by this letter under its existing oversight agreement with DTSC." Accordingly, the RWQCB directed TLCP to continue working with DTSC staff to "establish appropriate cleanup goals for the soil and groundwater at the TLCP site, for the protection of human health and the environment." J.A. 34. Discoveries of similar and/or related TPH contaminated soils on certain portions of TLCP property followed in 2007, 2008, and 2009. TLCP submitted its site management plan to DTSC for approval in August 2009. DTSC formally approved the plan, noting that it complied with the requirements of the Voluntary Cleanup Agreement between the parties. Over the next year, TLCP completed the majority of its remediation efforts.

Beginning in 2007, TLCP submitted claims to Indian Harbor under the TLCP Policy seeking reimbursement for costs associated with the remediation of TPH contamina-

tion.  Indian Harbor complied with its obligations under the policy and, at the time of initiating this action, had reimbursed TLCP an amount in excess of $5,000,000 for costs associated with the remediation of TPH contamination at the former MCAS Tustin.  Indian Harbor requested indemnification from the Navy in a letter on July 31, 2009.  On April 14, 2010, Defendant issued a final decision denying Indian Harbor's Section 330 Claims.

Indian Harbor subsequently filed suit in the Court of Federal Claims seeking $5,331,872.09, plus interest and any additional amounts proven at trial, pursuant to Section 330.  The United States moved to dismiss.  Following briefing by the parties, oral argument was held on June 20, 2011.  On June 28, 2011, the Court of Federal Claims granted Indian Harbor's unopposed motion to file its First Amended Complaint, which clarified Count II of the Complaint.  On July 5, 2011, the Court of Federal Claims granted the Defendant's motion in part, dismissing Count I of Indian Harbor's Complaint on grounds that Indian Harbor failed to allege facts plausibly suggesting the existence of a "claim for personal injury or property damage" as required under Section 330.

In its opinion, the Court of Federal Claims focused on what constitutes "a claim for personal injury or property damage" triggering the government's duty to indemnify under Section 330.  Specifically, the court questioned whether the correspondence received by the TLCP from state regulators demanding that the developer remediate the pollution properly constituted a "claim for personal injury or property damage" and, in construing the terms of Section 330, made several interpretive findings.  According to the court below, Section 330 only contemplates indemnification where "the owner or developer of a former military property is subject to some action brought

against him" by a third-party. *Indian Harbor*, 100 Fed. Cl. at 243. Thus, a third-party claim for personal injury or property damage, "regardless of how the third-party allegation is denominated (a suit, claim, action, etc.) and regardless of how fully developed it is (a mere demand or a judgment)", is a necessary predicate for indemnification under Section 330. In addition, the Court of Federal Claims determined that "a straightforward reading dictates that the action brought by the third-party must allege injury to *that* person or damage to *his* property." *Id.* at 244 (emphases in original). The court provided the examples of a property developer sued by a downstream farmer whose water supply had been contaminated by toxic runoff from the developer's land and a developer receiving a demand letter from home buyers subsequently diagnosed with cancer as being subject to indemnification under Section 330. *Id.* But the Court of Federal Claims emphasized that "a developer who must clean up its own lands that were insufficiently remediated by the government prior to transfer" is not entitled to compensation under the statute. *Id.*

The Court of Federal Claims recognized that its decision was contrary to a previous Court of Federal Claims holding in *Richmond American Homes of Colorado, Inc. v. United States*, 75 Fed. Cl. 376 (2007), but found that the court there had relied inappropriately on legislative history in interpreting the plain language of the statute. Instead, the Court of Federal Claims looked approvingly to a later decision in *American International Specialty Lines Insurance Company v. United States*, No. 05-1020, 2008 U.S. Claims LEXIS 481, 2008 WL 1990859 (Fed. Cl. Jan. 31, 2008), where the court held that a letter from the DTSC requiring remediation could not be the basis of a claim under Section 330. The trial court considered Indian Harbor's argument that the legislative history of

Section 330 supported a broader reading of triggering claims, but determined that, as a general matter, "reference to legislative history is inappropriate when the text of the statute is unambiguous," *Indian Harbor*, 100 Fed. Cl. at 244 (citing *Dept. Of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002)), which it concluded was the case with Section 330. The court noted, moreover, that statements made by Senator John McCain of Arizona on which the court relied in *Richmond*, had been made in connection with a version of Section 330 that did not contain language requiring a "claim for personal injury or property damage" as a predicate to indemnification because that clause was added to the bill by the conference committee, after legislators' statements in support of the bill had been recorded.

After construing the statute, the Court of Federal Claims held that the DTSC and RWQCB's communications with the TLCP were not "claim[s] for personal injury or property damage" within the meaning of Section 330. In so finding, the court expressly rejected Indian Harbor's arguments that a state's environmental regulatory actions designed to prevent injury to its citizens or damage to their property trigger indemnification under Section 330. Specifically, the court found a distinction between a state enforcing a generally applicable environmental regulation pursuant to its police power and, as plaintiff argues is the case here, the state bringing a legal claim ex rel its citizens. Having found that Indian Harbor is not entitled to Section 330 indemnification, the Court of Federal Claims declined to consider the government's argument that Indian Harbor's initial reluctance to provide proper documentation regarding its claim was an independent basis upon which the government legitimately could refuse to indemnify TLCP for its remediation costs.

On September 30, 2011, Indian Harbor requested leave to file its Second Amended Complaint, removing Count II of the Complaint which requested relief under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The Court of Federal Claims granted Indian Harbor's motion on October 27, 2011 and deemed the Second Amended Complaint, which contains only Count I, relating to Section 330, filed as of that date. The Court of Federal Claims then entered final judgment dismissing Indian Harbor's Second Amended Complaint on October 31, 2011. Indian Harbor timely appealed and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## III.

We review de novo a decision to dismiss a complaint for failure to state a claim under RCFC 12(b)(6), just as we do dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). "[A] complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). An underlying issue of statutory interpretation is a question of law, which we review de novo. *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1108 (Fed. Cir. 2004).

When interpreting a statute, we start with the language of the statute itself. *Williams v. Taylor*, 529 U.S. 420, 431 (2000). We search for Congress's intent using

both the text and structure of the statute. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001). In reviewing the statute's text, we give the words "their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." *Williams*, 529 U.S. at 431 (*quoting Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("In determining the scope of a statute, we look first to its language, giving the words used their ordinary meaning." (citations and internal quotation marks omitted)). If the statute is clear and unambiguous, then the plain meaning of the statute is generally conclusive, and we give effect to the unambiguously expressed intent of Congress. *Sullivan v. Stroop*, 496 U.S. 478, 482 (1990). When the statutory language is ambiguous, legislative history can be useful in determining Congressional intent. *See In re Swanson*, 540 F.3d 1368, 1376 (Fed. Cir. 2008).

## A.

Indian Harbor first argues that the Court of Federal Claims erred in holding that a valid claim for indemnification under Section 330 must arise from a third-party "action" against the Section 330 claimant. The government argues that the court below created no new requirement for an "action" and that the Court of Federal Claims expressly recognized that "a variety of procedural devices can trigger indemnification - a suit, claim, demand or action, liability, judgment, cost or other fee - they all share a common genesis." J.A. 9. Thus, according to the government, the Court of Federal Claims was merely describing the relationship between the various clauses of the statute in order to elucidate the plain meaning of the statutory text, and used the term "action" as shorthand

for the clause in Section 330 articulating the various ways that indemnification could be triggered.

Although the plain language of Section 330 is clear that there must be a "suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage," we find no support for the proposition that the claim for personal injury or property damage must be adversarial. Specifically, we agree with the reasoning of the Court of Federal Claims in *Richmond*, finding that a state agency's exercise of its regulatory authority demands compliance and suffices to meet the requirement of a "claim" under Section 330. 75 Fed. Cl. at 393 ("Under the circumstances of this case, the CDPHE's exertion of regulatory authority cannot be construed as a mere 'invitation to voluntary action.' The Compliance Advisory directs its recipients to comply now or pay the price in fines later.") (internal citations omitted). Thus, we see no reading of the plain language resulting in the conclusion that that the RWQCB's communications with TLCP do not constitute a "claim" under Section 330.

The May 14, 2008, letter clearly articulates a threat to groundwater in the State of California, identifies the RWQCB as a responsible party for the protection of said groundwater, and provides the statutory authority for the RWQCB to take enforcement action "for failure to cleanup and abate waste discharges, and to take necessary remedial action." J.A. 34. As Indian Harbor emphasized at oral argument, this letter merely represents the first step in which the State of California, through the RWQCB, enforces environmental regulations related to water quality. Under the California Water Code, Sections 13304 and 13350, the RWQCB has the authority to, inter alia, seek injunctive relief prohibiting certain conduct or

requiring compliance with a clean-up order, recover monetary damages either civilly or pursuant to the code, or institute its own clean-up of the affected areas and then seek reimbursement and penalties from TLCP.[1] Like the claimant in *Richmond*, TLCP was not in a position to ignore the communication from the RWQCB.

### B.

The Court of Federal Claims additionally held that "a straightforward reading dictates that the action brought by the third-party must allege injury to *that* person or damage to *his* property" and that "Section 330 requires indemnification only when an entity . . . is subject to a third-party proceeding arising from an injury to that third-party or damage to its property . . . ." *Indian Harbor*, 100 Fed. Cl. at 244 (emphasis in original). Indian Harbor argues that the Court of Federal Claims erred in imposing an ownership requirement on the third-party bringing the "action." The government disagrees with Indian Harbor's characterization of the court's holding and asserts that the court did not create a statutory requirement of "ownership" but merely explained that the third-party claimant itself must suffer personal injury or property damage. The government's characterization more accurately reflects the court's decision but we nonetheless find that decision to be in error.

As with its findings regarding a proper Section 330 third-party claimant, the Court of Federal Claims provides no justification for its requirement that the claim

---

[1]    Likewise, because Section 330 explicitly authorizes the recovery of costs associated with "threatened release of any hazardous substance," the RWQCB need not have waited for actual release of hazardous materials into the groundwater prior to making its claim against TLCP.

for property damage relate to injury or damage to the claimant itself or the claimant's property. We agree that "Section 330 would unquestionably apply to a property developer who was sued by a downstream farmer whose water supply had been contaminated by toxic runoff from the developer's land" or to "a residential developer of a former base who received a demand letter from home buyers subsequently diagnosed with cancer." *Id.* From those unsurprisingly indemnified scenarios, however, the Court of Federal Claims leaps to the conclusion that Section 330 must not apply to "a developer who must clean up its own lands that were insufficiently remediated by the government prior to transfer." *Id.* We disagree. By its plain language, Section 330 protects a purchaser of the land against "cost[s] or other fee[s]" arising out of property damage (including economic loss) that results from the release or threatened release of any hazardous substance. Nothing in Section 330, however, requires that the claimant itself suffer personal injury or own the damaged property. As such, we see no reason why expenditures associated with remedies pursued by the RWQCB against TLCP—whether they be, for example, costs resulting from a clean-up order or imposed penalties—are not properly considered a "cost or other fee" within the meaning of Section 330.

## C.

The Court of Federal Claims is correct that, as a general matter, "reference to legislative history is inappropriate when the text of the statute is unambiguous." *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002). As discussed above, we find no ambiguity in the statute necessitating reliance on anything other than the plain language of Section 330. We note, however, that our interpretation is fully consistent with the legislative

history surrounding the enactment of Section 330 and the overall statutory scheme incentivizing base transfer. As the Court of Federal Claims in *Richmond* recognized, looking to the interaction of Section 330 and the Base Closure Act, Section 330 is consistent with the Base Closure and Realignment Commission's underlying purpose, which is to encourage economic development of former military facilities and their surrounding populations. *Richmond*, 75 Fed. Cl. at 386-87 (collecting references). "These goals can only be achieved by addressing the potential disincentives and environmental risks inherent in assuming ownership of property that was once used by military services." *Id.*

Indian Harbor also points to statements made by Senator McCain in opposition to an earlier version of Section 330 which would have insulated the Government from liability rather than protect a purchaser of former military property. Like the court in *Richmond*, we find it useful to quote Senator McCain's comments at length:

> Under current law, receivers of closed base property can be successfully sued for pollution caused by Defense Department activities. Such suits might include environmental cleanup orders or civil damage claims.
>
> This situation is unjust and it must be remedied. We simply cannot ask States or businesses to assume potentially devastating liability for conditions they did not create. Moreover, the Federal Government has a duty to accept full and unconditional responsibility for its actions.
>
> Last year, I introduced legislation to ensure that the Federal Government remains fully responsible

for hazardous waste problems at military installations after base closure. The bill requires the Department of Defense to defend, hold harmless, and indemnify innocent receivers of the property against claims arising from pollution caused by military activities.

This protection is absolutely critical if we are to promote the timely and efficient transmission of base property to new and productive uses. How many States or employers are anxious to acquire base property without such protection?

\* \* \*

In many cases, hazardous dumping by the military occurred prior to the enactment of our environmental laws. Such dumping probably would not be defined as negligent. Under the committee bill [proposed amendment] that would mean receivers of closed base property could not receive indemnification. The unfortunate result is that the innocent property owner pays for Uncle Sam's mistakes.

\* \* \*

Mr. President, base closure is a difficult and traumatic period for local economies which have grown dependent on the employment and economic activity provided by defense installations.

We have a Federal obligation to help facilitate a safe and timely transfer of base property to other productive uses. We cannot possibly achieve that goal if those who would put that property to use must risk everything in the process.

We must do what is right - ensure, without condition, that the Federal Government will defend and indemnify states and employers who are sued over pollution caused by Federal activities. My amendment will accomplish that goal.

138 Cong. Rec. 25905-06 (1992). Indian Harbor also directs us to a letter from the Department of Defense to Senator McCain—made part of the congressional record—expressing its displeasure with Section 330:

This is in reply to your letter of November 5, 1992, to Secretary Cheney, requesting confirmation that the Department will apply those provisions of the 1993 Authorization Act . . . which require the Department to indemnify certain transferees of DoD real property.

* * *

Quite frankly, the Department did not support either [the FY 93 Authorization Act or the FY 93 Appropriations Act], largely because of the dramatic impact both may have on the Department's liability. The Department does not hesitate to shoulder its responsibility for cleaning up contamination. However, both Acts appear to go much father, perhaps effectively eliminating such legitimate limitations on the Department's liability as defense under the Tort Claims Act and other defenses. The wholesale shift of all risks to the Department may, unfortunately, delay the transfer of base closure properties until the Department can adequately assess its risks with regard to those properties.

Letter from David Berteau, Principal Dep. Asst. Secretary of Defense, to Sen. McCain (Feb. 3, 1993) 139 Cong. Rec. 15156-57 (1993).

Both the government and the Court of Federal Claims dismiss the legislative history as misleading and inapplicable. While the Court of Federal Claims is correct that Senator McCain's statements refer to an earlier version of the statute that did not contain the phrase "claim for personal injury or property damage," we, like the court in *Richmond*, find these statements—and the Department of Defense's contemporaneous interpretation—useful in confirming our reading of the unambiguous plain language in Section 330. There is nothing to suggest that addition of the phrase "claim for personal injury or property damage" was intended to limit the scope of governmental indemnification in a way that ignores the original purpose of the Act. The Court of Federal Claims reads far too much into that clause; we decline to do so.[2]

## CONCLUSION

For the reasons stated above, we reverse the Court of Federal Claims' dismissal of Indian Harbor's complaint and remand for proceedings in accordance with this opinion.

### REVERSED AND REMANDED

---

[2]    There is nothing to explain the Conference Committee's reasoning in adding the clause. Whatever the intent, we read it to limit the type of damages recoverable—i.e., to exclude hedonic damages or lost profits—not to impose the type of third party requirements the Court of Federal Claims reads into it.

## COSTS

No costs