# In the United States Court of Federal Claims

No. 11-742C
(Filed October 18, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TANYA L. TOWNE, | |
| Plaintiff, | |
| v. | 10 U.S.C. § 1212(c)(1)(A), "combat-related operations", *Chevron* deference. |
| THE UNITED STATES, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

This is a military disability claim brought by Plaintiff, Tanya L. Towne ("Towne") against the United States for enhanced severance pay which was allegedly wrongfully and unlawfully withheld by the Department of the Army ("Army"). This case was originally assigned to Judge George W. Miller, but it was reassigned to the undersigned on July 26, 2013.

Currently pending before the Court are cross-motions for judgment on the administrative record. Likewise pending is Plaintiff's motion for leave to proceed *in forma pauperis*. For the reasons that follow, the Government's motion for judgment on the administrative record is GRANTED and Towne's cross-motion is DENIED. Towne's motion for leave to proceed *in forma pauperis* is GRANTED, in part, with respect to the filings pertaining to the cross-motions and DENIED in all other respects.

## I. Background[1]

### a. Towne's Service and Injury

---

[1] Portions of this background have already been established in Judge Miller's Opinion and Order dated October 25, 2012. For purposes of consistency and ease of reading, this Court repeats much of the background established in Judge Miller's Opinion and supplements it with the additional details established during remand to the Army Board for Correction of Military Records ("ABCMR"). Where this Opinion repeats facts established in Judge Miller's Opinion, the Court omits citations to the administrative record.

1

Towne began her military service when she enlisted in the New York Army National Guard ("National Guard") on March 17, 1993. Towne injured her back in the line of duty while lifting and moving a computer on August 17, 2000. On June 4, 2004, Towne suffered another back injury when she fell in full body armor through a window to the floor approximately eight feet below during a building-clearing exercise as training for active duty service in Operation Iraqi Freedom. This training took place in Fort Drum, New York. Towne was then deployed to Iraq and Kuwait for ten months in 2005. During that time, she was required to wear body armor, which aggravated her back. Effective July 16, 2009, Towne was honorably discharged from the National Guard.

### b. *Calculation of Military Disability Severance Pay*

Certain disabled former members of the armed forces are entitled to severance pay after they are discharged from service. 10 U.S.C. §1203; *see generally id.* at §§1201-1222. Typically, a disabled service member's severance pay is determined by multiplying twice the member's monthly pay by the number of years the member has served. *Id.* at §1212(a). The Wounded Warrior Act (the "WWA"), which became Title XVI of the National Defense Authorization Act of 2008 (the "NDAA 2008"), amended §1212 by adding the current subsection (c). National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1646(a), 122 Stat. 3, 472 (2008). The resulting law ensures that disabled service members qualify for certain minimum severance payments, even if their service time would otherwise have been insufficient to qualify them for those payments under the general formula. 10 U.S.C. § 1212(c). All service members are now credited with at least three years of service for the purpose of calculating disability severance payments. *Id.* at § 1212(c)(1)(B). Additionally, service members whose disability was either incurred "in line of duty in a combat zone … or incurred during the performance of duty in *combat-related operations as designated by the Secretary of Defense*" (the "Secretary") are credited with at least six years of service time. *Id.* at § 1212(c)(1)(A) (emphasis added).

The Under Secretary of Defense for Personnel and Readiness issued a Directive-Type Memorandum (the "DTM") on March 13, 2008, that, *inter alia*, defined the phrase "incurred during performance of duty in combat-related operations" in § 1212(c)(1)(A). David S.C. Chu, Office of the Under Sec'y of Def. for Pers. and Readiness, *Revised and New Policies to Implement the National Defense Authorization Act (NDAA) for Fiscal Year 2008*, at 4 (2008). The DTM amended the Department of Defense Instruction ("DoDI") 1332.38 to add that "determination of 'incurred during performance of duty in combat-related operations' shall be made consistent with criteria set forth in paragraph E3.P5.1.2." *Id.* Paragraph E3.P5.1.2 reads:

> E3.P5.1.2. Armed conflict (5 U.S.C. 3502, 5532, 6303)(Reference (c)). The physical disability is a disease or injury incurred in the line of duty as a direct result of armed conflict. The fact that a member may have incurred a disability during a period of war or in an area of armed conflict, or while participating in combat operations is not sufficient to support this finding. There must be a

definite causal relationship between the armed conflict and the resulting unfitting disability.

E3.P5.1.2.1. Armed conflict includes a war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerrilla action, riot, or any other action in which Service members are engaged with a hostile or belligerent nation, faction, force, or terrorists.

E3.P5.1.2.2. Armed conflict may also include such situations as incidents involving a member while interned as a prisoner of war or while detained against his or her will in custody of a hostile or belligerent force or while escaping or attempting to escape from such confinement, prisoner of war, or detained status.

Department of Defense, Instruction No. 1332.38, at 35 (1996). Paragraph E3.P5.1.2 of DoDI 1332.38 had previously interpreted the statutory language "as a direct result of armed conflict." Because the DTM relies on paragraph E3.P5.1.2 to also interpret "combat-related operations," the DTM effectively defines "in combat-related operations" to mean "as a direct result of armed conflict."

### c. Procedural History

After Towne returned from Iraq, she was referred to an informal Physical Evaluation Board ("PEB") that reviewed her back injury, found her unfit for service, and made several findings related to her disability severance benefits. Blocks 10(C) and 10(D) of the PEB's report included the following recommended findings:

C.  DISABILITY DID RESULT FROM A COMBAT RELATED INJURY AS DEFINED IN 26 USC 104 AND FOR PURPOSES OF 10 USC 10216(G).[2]

D.  DISABILITY WAS NOT INCURRED IN A COMBAT ZONE OR INCURRED DURING THE PERFORMANCE OF DUTY IN COMBAT-RELATED OPERATIONS AS DESIGNATED BY THE SECRETARY OF DEFENSE (NDAA 2008 [§] 1646).[3]

The Army Physical Disability Agency ("APDA") adopted the PEB's findings. Adhering to the PEB's finding in Block 10(D) of its report, the APDA did not credit Towne with

---

[2] The PEB's finding that Towne's injury was combat-related allowed Towne to exclude her disability severance payments from gross income for tax purposes. *See* 26 U.S.C. § 101(a)(4), (b)(2)(C).

[3] "NDAA 2008 § 1646" refers to the section of the WWA in which Congress amended 10 U.S.C. § 1212 to add the current subsection (c), which contains the "combat-related operations" language that is in dispute in this case. *See* § 1212(c)(1)(A).

the six year of service time § 1212(c)(1)(A) might otherwise have allowed.[4]  The APDA instead credited Towne with only her actual service time of four years, eight months, and nine days.  Based on the PEB's finding in Block 10(C) of its report, however, APDA agreed that Towne's disability resulted from a combat-related injury for purposes of 26 U.S.C. §104.  Towne's counsel contacted the APDA to request that the APDA reconcile its determinations that her injury was a combat-related injury but that it does not occur during combat-related operations.  The APDA responded that the DoD's definition of "combat-related operations" was different from the definition of "combat-related injury," and thus the APDA declined to modify the PEB's findings.

On January 6, 2011, Towne filed an application with the ABCMR.  Towne argued, as she does here, that the DTM is invalid because it conflicts with Congress's intended meaning of "combat-related operations" in the WWA and the NDAA 2008 as it interprets "combat-related operations" §1212(c)(1)(A) more narrowly than Congress intended by excluding conditions simulating war.  Therefore, Towne argued, she should be credited with six years of service for purposes of calculating her disability severance pay.  The ABCMR denied Towne's application on October 4, 2011.  In its decision, the ABCMR applied the DTM without responding to Towne's argument that the DTM is contrary to the statute it purports to interpret.

### d.  Present Action

Following denial of her ABCMR application, Towne filed her Complaint in this Court.  The Complaint recites the facts described above and argues, as Towne did before the ABCMR, that Congress intended the DoD's interpretation of "combat-related operations" to include training under conditions simulating war.  Towne cites as evidence of Congress's intent (a) definitions of other phrases in the WWA, elsewhere in the NDAA 2008, and in other statutes that include the term "combat-related"; (b) the need to avoid an interpretation that renders the "combat-related operations" prong of § 1212(c)(1)(A) superfluous; (c) the need to avoid an interpretation of "combat-related" that renders meaningless the word "related"; and (d) legislative history of the WWA.  Towne points specifically to 10 U.S.C. § 1413a(e) and 26 U.S.C. § 104(b)(3), in which Congress defined "combat-related disability" and "combat-related injury," respectively.  In both cases, Congress specified that injuries sustained under "conditions simulating war" are within the scope of the definitions.[5]  § 1413a(e)(2)(C); § 104(b)(3)(A)(iii).

---

[4] Plaintiff remained eligible for severance pay based on the three-year minimum provided by 10 U.S.C. § 1212(c)(1)(B).  That provision did not provide Towne any additional benefit, however, because her actual service time was greater than three years.

[5] Congress has referenced repeatedly the definition of "combat-related disabilities" set forth in § 1413a(e), namely, in 5 U.S.C. § 6333(b)(2)(C)(i) (exemption of members who have sustained a combat-related disability from exhaustion of annual and sick leave before using transferred leave); 10 U.S.C. §§ 1074i(d)(3) (travel expense reimbursement for care of combat-related disabilities), 1175a(h)(2)(B) (no reduction in combat-related disability pay due to receipt of additional voluntary separation benefits), 1414(d)(1) (retirement pay cannot be combined with combat-related disability pay), 10216(g)(1)

Likewise, in paragraph E3.P5.2.2 of DoDI 1332.38 relating to tax benefits under 26 U.S.C. § 104, the DoD defines "combat-related" to include disabilities resulting "[u]nder conditions simulating war." As relief, Towne requests the additional disability severance pay she would have received upon a determination that her disability occurred during the performance of duty in combat-related operations. *See* 10 U.S.C. § 1212(c)(1)(A).

The Government filed a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). For each piece of evidence Towne cites, the Government argues that such evidence is not dispositive of Congress's intent. In short, the Government argues that none of Towne's evidence is sufficient to demonstrate Congress's intent, and therefore the definition of "combat-related operations" is "entirely up to the discretion of the Secretary of Defense." Towne responded by filing a cross-motion for judgment on the administrative record.

### e. Judge Miller's Opinion and Remand to the ABCMR

On October 25, 2012, Judge Miller issued an Opinion and Order deferring his ruling on both the Government's motion and Towne's. In that Opinion, Judge Miller determined that, "[a]ssuming the DTM was not issued arbitrarily or capriciously, the Court would utilize the *Chevron*[6] framework to interpret §1212(c)(1)(A) and the DTM." (Docket No. 16 at 7). However, Judge Miller concluded that he could not ascertain the basis for the DTM and, therefore, he could not determine whether the DTM was arbitrary or capricious. In order to determine the basis for the DoD's definition of "combat-related operations," Judge Miller remanded the case to the ABCMR with instructions that the ABCMR provide the DoD "an opportunity to explain the reasons for its interpretation of 'combat-related operations' in the DTM, particularly its decision to exclude 'conditions simulating war' from its definition of 'combat-related operations.'" *Id.* at 10.

On February 15, 2013, the DoD issued an advisory opinion ("DoD Opinion") explaining its interpretation of §1212(c)(1)(A) and why "combat-related operations" do not include injuries incurred during service training. *See* Supplement to the Administrative Record (Docket No. 23-2) ("Supp. AR"), at 25-27. The DoD provided a rather detailed explanation of its decision to exclude service training from its definition of "combat-related operations."

On April 16, 2013, the ABCMR again heard Towne's case, this time with the benefit of the DoD Opinion. The ABCMR concluded that the DoD had provided a "reasonable interpretation" of §1212(c)(1)(A). *See* Supp. AR at 11-12. Based on its review, the ABCMR affirmed its previous decision to deny Towne relief. *Id.* The details of both the DoD Opinion and the ABCMR's decision are addressed below.

---

(retaining certain former dual-status military technicians with combat-related disabilities); and 37 U.S.C. § 303a(e)(3)(E) (entitlement of members with combat-related injuries to previously earned or paid special pay).

[6] *See infra*, Sec. III.a.

The parties informed the Court of the ABCMR's decision and Judge Miller ordered supplemental briefing in light of the new ABCMR. Briefing was concluded on July 19, 2013. Both parties filed their supplemental briefs on the same day, so the arguments presented in each are not necessarily responsive to the opposing side's arguments. The case was then reassigned to the undersigned on July 26, 2013.

### f. The DoD Opinion and ABCMR Decision

After a brief discussion of NDAA 2008, the DoD Opinion describes the considerations that went into the DoD's definition of "combat-related operations." The DoD Opinion explains that DoD's analysis started at the DoD Dictionary of Military Terms (the "Dictionary").[7] The Dictionary defines "operations" as "[a] series of tactical actions with a common purpose or unifying theme" or "[a] military action or the carrying out of strategic, operational, tactical, service, *training* or administrative military mission." (emphasis added). These definitions are derived from Joint Publication ("JP") documents that set forth joint doctrine to govern activities and performance of the Armed Forces of the United States in joint operations. *See* Supp. AR at 26.

The DoD Opinion observes that JP 3, from which the second definition is derived, groups the term "Operations" into three areas. These areas are:

(1) Military Engagement, Security Cooperation, and Deterence – these are ongoing routine activities that establish, shape, maintain, and refine relations with other nations and domestic civil authorities (e.g., state governors or local law enforcement);
(2) Crisis Response and Limited Contingency Operations – these can be small-scale, limited duration operations such as strikes, raids, and peace enforcement, which might include combat depending on the circumstances; [and]
(3) Major Operations and Campaigns – these are extended-duration, large-scale operations that usually involve combat.

*See* Supp. AR at 26. Thus, the DoD Opinion states that operations under the first grouping do not qualify because they are not combat-related. The DoD concluded that "DoD activities[,] such as service training, would not qualify because it is neither an operation nor combat-related." *Id.*

The DoD's construction centers around an ideal that it calls "the tip of the spear." The DoD Opinion states that it intended its definition to secure entitlement to enhanced severance pay to service members "at the tip of the spear," i.e., "those service members taking the greatest risks and waging the war at risk of death or serious injury." *Id.* The DoD's conclusion to provide enhanced payment to those "at the tip of the spear" was bolstered by other sections of NDAA 2008 (§§ 511a, 641, 1632, 1675), all of which apply to "combat-related disabilit[ies]" and all of which cross-reference the statutory

---

[7] The Dictionary is available at http://www.dtic.mil/doctrine/dod_dictionary/.

definition of "combat-related disability" in 10 U.S.C. § 1413a. The DoD Opinion notes that combat-related disabilities under that definition can be incurred during activities other than "combat-related operations," such that "'combat-related operations' contemplated something more, and that the 'enhanced' severance pay for combat-related operations would be a '*special*' benefit for those injured at the 'tip of the spear.'" *Id.*

Next, the DoD Opinion cites the provisions of DoDI 1332.38, quoted above, that define "armed conflict." The DoD Opinion explains that the DoD intended to limit its definition of "combat-related operations" to disability or injury incurred in the line of duty as a direct result of armed conflict. Such a definition was deemed to ensure that service members at the "tip of the spear" would receive enhanced benefits.

The ABCMR Decision is largely a summary of the DoD Opinion. It recognized Towne's arguments, which generally mirror the same arguments she makes at this Court. The ABCMR Decision summarily concluded that the DoD "has articulated a reasonable interpretation of [combat-related operations]." Supp. AR at 11. Equally summarily, the ABCMR rejected Towne's arguments. It affirmed its previous decision to deny Towne relief.

## II. Standard of Review

A motion for judgment upon the administrative record is governed by RCFC 52.1. In considering such motions, a court asks "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (Bush, J.) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). A reviewing court must make fact findings where necessary. *Bannum*, 404 F.3d at 1356. As such, the resolution of cross-motions brought pursuant to RCFC 52.1 is akin to an expedited trial on the paper record. *Id.* The precise standards and criteria governing the Court's review may vary depending upon the specific law to be applied to a particular case. *See* RCFC 52.1 Rules Committee Note (2006).

## III. Discussion

Essentially, the dispute in this case boils down to whether or not the DoD's regulation pertaining to "combat-related operations" is arbitrary and capricious. For this reason, the Court first discusses the standard under which the regulation is to be reviewed. Then, it turns to the arguments over the DoD's construction of the statute. Finally, it addresses Towne's argument that the DTM had expired, and was therefore not controlling, when her claim was before the ABCMR.

### a. The Court Reviews the DoD's Regulations under the Chevron Framework.

Judge Miller stated in his Opinion that, "[a]ssuming the DTM was not issued arbitrarily or capriciously, the Court would utilize the *Chevron* framework to interpret

7

§1212(c)(1)(A) and the DTM." (Docket No. 16 at 7). The *Chevron* framework was established by the Supreme Court in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). There, the Supreme Court observed that, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Id.* at 842. The Supreme Court instructed courts to consider first "whether Congress has directly spoken to the precise question at issue." *Id.* If Congress has done so, the Court (and the agency) must give effect to the "unambiguously expressed intent of Congress." *Id.* at 843. However, when Congress has not unambiguously expressed its intent, a court should "not simply impose its own construction on the statute." *Id.*

These ambiguous statutes give rise to the second question identified in *Chevron*: whether the agency's construction is based on a permissible construction of the statute. *Id.* "The power of an administrative agency to administer a congressionally created … program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Where Congress has explicitly delegated authority to an agency, the agency's regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

> b. *Congress has not "directly spoken to the precise question at issue."*

The "precise question at issue" here is whether Congress has spoken to the meaning of "combat-related operations." The lion's share of the parties' briefing is dedicated to parsing this phrase and to applying canons of statutory construction to it. Unsurprisingly, the parties sometimes apply different canons and arrive at diametrically opposed conclusions.[8]

Despite Towne's best arguments, Congress has clearly *not* provided a definition of "combat-related operations." In arriving at this conclusion, the Court begins with the Supreme Court's admonition that, "in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). In this case, this canon moves the ball a long way for the Government.

What the statute says is plain: Congress has delegated to the Secretary of Defense the duty of defining the scope of "combat-related operations." *See* 10 U.S.C. § 1212(c)(1)(A) (providing for enhanced severance pay for disabilities "incurred during the performance of duty in combat-related operations *as designated by the Secretary of Defense*."). To the extent that Congress has "directly spoken to the precise question" of

---

[8] The Court calls this outcome unsurprising because there are a number of canons and "counter-canons" of statutory construction which, if applied, will often lead to opposite interpretations of the same statute. *See* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules of Canons About How Statutes are to be Construed*, 3 Vand. L. Rev. 395 (1950), republished with permission in 5 Green Bag 297, 302 (2002).

what constitutes a "combat-related operation," it has spoken only so far as to delegate authority to the Secretary of Defense.

Although not put expressly in these terms, one undercurrent to Towne's entire argument is that Congress has repeatedly used the phrase "combat-related disability", which is defined in 10 U.S.C. §1413a. That section's definition includes "the performance of duty under conditions simulating war," § 1413a(e)(2)(C), which encompasses training exercises. Notably, Congress has referenced this definition of "combat-related disability" in a number of other statutes. *See*, *e.g.*, 5 U.S.C. § 6333(b)(2)(C)(i) (exemption of members who have sustained a combat-related disability from exhaustion of annual and sick leave before using transferred leave); 10 U.S.C. §§ 1074i(d)(3) (travel expense reimbursement for care of combat-related disabilities), 1175a(h)(2)(B) (no reduction in combat-related disability pay due to receipt of additional voluntary separation benefits), 1414(d)(1) (retirement pay cannot be combined with combat-related disability pay), 10216(g)(1) (retaining certain former dual-status military technicians with combat-related disabilities); and 37 U.S.C. §303a(e)(3)(E) (entitlement of members with combat-related injuries to previously earned or paid special pay).

Despite these numerous references, the Court cannot conclude that Congress has spoken to the specific issue of what constitutes "combat-related operations." First, unlike all of the other statutes, § 1212(c)(1)(A) does not cross-reference §1413a. Second, unlike all of the other statutes, § 1212(c)(1)(A) *does* expressly delegate authority to the Secretary of Defense to designate what constitutes a "combat-related operation." Thus, the clear intent of Congress was to leave to the Secretary the authority to define that term. The Court, therefore, must proceed to the second *Chevron* question.

### c. The DoD's construction is not arbitrary, capricious, or manifestly contrary to the statute.

While the first *Chevron* question can be dealt with in a summary manner, the second is much more difficult. Here, the question becomes whether the Secretary's definition is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. The Court concludes that it is not. Because Towne has presented several extensive arguments in support of her assertion that the DoD Opinion is arbitrary or capricious, the Court addresses each argument separately.

### i. The DoD's Interpretation of "Combat-Related Operations" was not Contrary to Ordinary Rules of Statutory Construction

Towne first claims that by interpreting "combat-related operations" to mean "armed conflict," the DoD failed to follow ordinary rules of statutory construction. Towne takes issue with the DoD's conclusion that the absence of a cross-reference in § 1212(c)(1)(A) to § 1413a's definition of "combat-related disability" must mean that a "combat-related operation" means something else. Towne concludes that the DoD, and the ABCMR, must have applied the canon that holds that when "Congress includes particular language in one section of a statute but omits it in another section of the same

9

Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Instead, Towne argues that the correct reading of the statute requires that the DoD recognize that the term "combat-related" is the same in both statutes.

The Court finds that the DoD's interpretation of the statute was not contrary to ordinary rules of statutory construction. As Towne herself recognizes, *Russello* speaks directly to the issue: the "combat-related operations" provision does not contain the cross-reference that other "combat-related" provisions do, and the Court cannot ignore that fact. "[W]here there is an absence of any explicit connector between the two statutes, the Supreme Court has declined to read a definition from one statute into another, finding the absence of a cross-reference to be revealing." *In re Princo Corp.*, 486 F.3d 1365, 1368 (Fed. Cir. 2007) (internal quotations omitted) (citing *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 220 (1996)). "Even when the definition appears in a single statute, our sister courts have also held that definitions limited to one section should not be applied to another section." *Princo*, 486 F.3d at 1368.

The language of the statute also undermines Towne's position: She claims that the definition of "combat-related disability" must be used to inform the interpretation of "combat-related operations," but the term "disability" is itself used in § 1212(c)(1)(A): the enhancement is applied to members "separated from the armed forces for a *disability* incurred in line of duty in a combat zone (as designated by the Secretary of Defense *for purposes of this subsection*) or incurred during the performance of duty in combat-related operations as designated by the Secretary of Defense." If, as Towne argues, "Congress plainly knew how to deploy adjectives," and it intended to grant enhanced payments to members suffering from combat-related disabilities, it could have easily said that members are entitled to enhanced payments if they were "separated from the armed forces for a combat-related disability." It did not do so.

There is, however, a more fundamental, if not so obvious, point to be made with respect to these statutes. The relevant term of art is *not* "combat-related." Instead, the term of art relevant to this case is "combat-related *operations*." This distinction is borne out by one factor which Towne conveniently ignores: the "combat-related operations" provision is the *only* "combat-related" law cited by the parties in which Congress explicitly granted authority to the Secretary to define. It is not unreasonable to conclude, as the DoD did, that this unique factor sets the "combat-related operations" language apart from other combat-related provisions.

These unique factors—different language and an express delegation of authority—tell the Court that there is something different about the "combat-related operations" provision. Although Towne's explanation is reasonable, the Court cannot say that the DoD's interpretation is *un*reasonable. This statutory argument is not persuasive.

10

*ii. The Term "Combat-Related" in Different Provisions of the WWA Can Be Interpreted Differently*

Towne next argues that because the term "combat-related" was used in two provisions of the WWA, it must be construed the same way in each provision. Towne relies upon another canon of statutory interpretation which holds that "identical words used in different parts of the same act are intended to have the same meaning." *See Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, --- U.S. ---, 132 S.Ct. 1997, 2004-05 (2012) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.") (internal quotations omitted). Because the WWA included two provisions which use the term "combat-related," Towne argues that they must be construed the same way.

As the Court just stated, the obvious implication of the unique language and delegation is that Congress intended "combat-related operations" to be construed separately from "combat-related disability." The DoD's use of the definition of "combat-related disability" in 10 U.S.C. § 1413a as instructive, but not controlling, is in accord with the cardinal canon under these circumstances. The Court cannot, therefore, conclude that the DoD interpretation is arbitrary or capricious based on this argument.

*iii. The Term "Combat-Related Operations" is not Used in Other Statutes, so the Doctrine of* In Pari Materia *Does Not Apply*

Towne next argues that the term "combat-related" must be construed following the canon of *in pari materia*, which directs courts to interpret statutes with similar language, and which address the same general subject matter, "as if they were one law." *See Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (citations omitted). In support of her position, Towne observes that Congress has applied a similar definition to "combat-related" terms other than "combat-related disability." *See* 26 U.S.C. § 104(b)(3) (defining "combat-related injury"). The definition of "combat-related injury" in 26 U.S.C. § 104(b)(3) mirrors the definition contained in 10 U.S.C. § 1413a.

Once again, the Court is not persuaded by Towne's argument. Her argument continues to ignore the very real differences between § 1212(c)(1)(A) and other "combat-related" statutory provisions. This argument is not sufficient to show that the DoD interpretation is contrary to law.

*iv. The WWA is Not Made Incoherent by Interpreting "Combat-Related Operations" Differently than "Combat-Related Disability"*

Towne next argues that the DoD failed to consider "combat-related operations" in the context of the WWA. Specifically, she asserts that the DoD failed to recognize that the WWA is a "coherent and consistent statutory scheme to enhance benefits for all injured members of the armed forces, regardless of the court of their injuries." (Docket

No. 25 at 9). The Government counters this point directly in its supplemental brief, arguing instead that the DoD did adequately consider the context of the provision in the WWA.

As this Court has already established, the failure to apply a single definition to two different but similar statutory provisions is not in and of itself incorrect. *See Princo*, 486 F.3d at 1368. Thus, the DoD's decision to interpret two similar-sounding provisions differently is not itself legal error. The fact that "combat-related" appears twice in the statute is not persuasive on its own.

Towne also argues that the DoD's narrow interpretation of "combat-related operations" undermines the WWA's purpose of providing enhanced benefits to all injured members of the armed forces. She claims that construing that phrase similarly to "combat-related disability" harmonizes the provisions of the WWA. The Government, in its supplemental brief, observes that its definitions does not create an inconsistent statute.

The Government's position here is reasonable. Towne cites the Congressional Record as evidence of her position, noting that Senator Levin observed that "[t]his wide-ranging legislation will improve the provision of health care and benefits to injured military personnel and make the system much more efficient as well." *See* 153 Cong. Rec. S9858 (daily ed. July 25, 2007). That statement does not require, as Towne seems to argue, that *all* injured members of the armed forces are entitled to enhanced benefits. Instead, it indicates Congress's desire to improve benefits and streamline the system.

Even with that point in mind, the DoD's narrow interpretation of "combat-related operations," does not undermine the statutory scheme embodied in the WWA. 10 U.S.C. § 1212(c)(1) contains *two* provisions, the second of which provides that all disabled members are entitled to a calculation based on a minimum of three years of service. The DoD's interpretation of "combat-related operations" does not dictate a result that some injured service members are unable to obtain disability severance payments; instead, it means that a service member is only entitled to *enhanced* payments in certain extenuating circumstances. This result does not undermine the purposes of the WWA.

> v. *The DoD's Interpretation Does Not Render Meaningless the "Combat-Related Operations" Prong of § 1212(c)(1)(A)*

Towne next relies upon the canon that no statute should be construed in a manner than would render any part of it "superfluous, void, or insignificant." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Towne argues that limiting the provision of enhanced benefits to injuries that arise only from "armed combat," the DoD has rendered meaningless the word "related" in "combat-related." As she states it, the "DoD's interpretation of the statutory language rendered insignificant the combat-related operations prong of [the statute], because any disability incurred as a result of armed conflict will typically be incurred in a combat zone and will fall within the combat zone prong of [the statute]." (Docket No. 25 at 11).

12

This point is Towne's most persuasive, but even so, it does not carry her burden. The Government refers to DoDI 1332.38, ¶ E3.P5.1.2, quoted above, in contradiction of Towne's argument. It observes, for example, that the raid against Osama Bin Laden's compound did not occur within a designated combat-zone, but ¶ E3.P5.1.2 ensures that people injured in such an operation would be entitled to enhanced severance payments. Towne counters this point by observing that operations like the assault on the Bin Laden compound arise in "relatively few or unique situations," such that the "combat-related operations" prong of the statute is rendered insignificant. (Docket No. 25 at 12).

The Government is, once again, correct. While the Bin Laden example proves the point that the DoD's construction extends beyond the confines of designated combat zones, there is another example of "armed conflict" in a non-combat zone: the attack on the U.S. Embassy at Benghazi, Libya. Libya was not designated as a combat zone at the time of the attacks. *See* www.irs.gov/uac/Combat-Zones. Yet this particular conflict would clearly fall under the DoD's definition of "combat-related operations," as it would qualify as either a "riot, or any other action in which service members are engaged with a hostile or belligerent nation, faction, force, or terrorists." *See* DoDI 1332.38, ¶ E3.P5.1.2.1. In addition, ¶ E3.P5.1.2.2 covers situations where a service member is imprisoned or detained—which situations clearly do not need to arise in a combat zone.

Although these situations may be uncommon, they suffice to show that the "combat-related operations" prong of § 1212(c)(1)(A) is not meaningless. Circumstances can, and do, arise outside of designated combat zones which nevertheless necessitate armed conflict. The DoD's construction of the statute ensures that, when such circumstances do arise, the participating service members are eligible for enhanced severance payments. This result is a reasonable reading of the statute.

Towne's final point to this argument is that the DoD's construction effectively results in treating "combat-related operations" only as "combat operations." This reading construes the DoD's construction too narrowly. To this Court's reading, DoDI 1332.38 allows for receipt of enhanced payments in non-combat (i.e., combat-related) situations. The extensive list of operations that fall under "armed conflict" in ¶ E3.P5.1.2.1 includes a number of operation types which require, for example, scouting, planning, transport, and any number of other activities that are not inherently combative and need not take place in a designated combat zone. Once again, the DoD's construction of "combat-related operations" appears to include these activities, and as such, its definition cannot be construed as strictly limited to "combat operations."

Although Towne has once again put forth an argument for why another construction might be reasonable, it has not demonstrated to this Court that the DoD's construction is *un*reasonable. In light of the DoD's careful consideration of the statute, the Court cannot say that Towne's arguments render the DoD's decision arbitrary, capricious or otherwise contrary to law.

13

### vi. The DoD's Interpretation is Not Inconsistent with the Legislative History of the WWA

Towne next attacks the DoD's interpretation on the basis of the legislative history of the WWA. She argues that this history is necessary to understanding the WWA and that the DoD's interpretation of the law is inconsistent with that history. Towne directs this Court to the statements of Senator Mark Pryor, who stated that "the section on disability severance pay … expands the population that is eligible for the enhancement of disability severance pay to include injuries incurred during performance of duty in support of combat operations" including "*in training exercises* before they are sent into theater." 153 Cong. Rec. S9198 (daily ed. July 13, 2007) (statement of Senator Pryor) (emphasis by Plaintiff). The Government, for its part, claims that there is no reason to consider the legislative history because the statute is unambiguous. Alternatively, the Government argues that if the Court does consider the legislative history, the DoD's construction is consistent with the legislative history of the WWA.

This Court sees no reason to consult the legislative history of the WWA because the language of the statute is unambiguous. *See DeCosta v. United States*, 987 F.2d 1556, 1558 (Fed. Cir. 1993) ("If the language of the section is unambiguous and the legislative history does not show that congressional intent was clearly contrary to the section's apparent meaning, that meaning of the statute controls, and there is nothing else for us to review.") (citing *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395 (Fed. Cir. 1990); *see also Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 954 (Fed. Cir. 2013) ("When the statutory language is ambiguous, legislative history can be useful in determining Congressional intent."). Here, the language of the statute unambiguously delegates to the Secretary of Defense the authority to define "combat-related operations." *See* 10 U.S.C. § 1212(c)(1)(A). Thus, the legislative history is unnecessary to understand the plain meaning of the statute.

Even if the Court found it necessary to consult the legislative history, the single reference uncovered by Towne is not persuasive. This is one statement out of *many* on the subject. Towne has not demonstrated to the Court that Senator Pryor's sentiments were held across the Senate, and even so, the language of the statute—the language adopted by the entire Congress—does not state what Senator Pryor indicates. Thus, again assuming that the statute is ambiguous, the Court would follow the Federal Circuit's guidance in observing that, "[i]f, however, the statutory language is ambiguous and the legislative history does not answer the precise question at issue, we must defer to the administrating agency's interpretation if it is reasonable." *DeCosta*, 987 F.2d at 1558 (citing *Chevron*, 467 U.S. at 842-44).

For these reasons, the Court does not believe that the legislative history dictates a finding that the DoD's interpretation is unreasonable. First, the statute is unambiguous in its delegation of authority. Second, even if it is ambiguous, the Court would not be persuaded by the statement of a solitary senator when his statement is not embodied in the statutory language.

*d.   The DoD's Definition of "Combat-Related Operations" Does not Conflict With its Definition "Combat-Related Disability"*

Instead of relying upon statutory canons, Towne's next argument takes a different tack.  She argues that the DoD has created conflicting regulatory definitions of "combat-related," and that it has failed to explain its reasoning.  Therefore, she asserts that the DoD's construction of "combat-related operations" is arbitrary and capricious.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009) ("*Unexplained* inconsistency is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal quotation omitted) (emphasis in original).

Towne notes that, in the case of combat-related disabilities, the DoD has interpreted "combat-related" to mean disabilities that arise due to (1) armed conflict, (2) hazardous service, (3) under conditions simulating war, or (4) caused by an instrumentality of war.  DoDI 1332.38, ¶ E3.P5.2.2.  Meanwhile, the DoD interpreted "combat-related operations" to mean "armed conflict."  *See id.* at ¶¶ 5.5.8.1, E3.P5.1.2.  This, she argues, is precisely the kind of conflict addressed in *Fox*.

Once again, the Court notes that the term at issue is *not* simply "combat-related."  It is "combat-related operations."  Moreover, the DoD did not actually do any interpreting in reaching its definition of "combat-related disability": that definition is drawn directly from 10 U.S.C. § 1413a(e), because the statute did not grant any interpretive authority to the DoD.  Meanwhile, the statute at issue in this case *explicitly* granted the Secretary interpretive authority.

Even if one accepts Towne's assertion that the DoD's interpretation of "combat-related" with respect to disabilities and injuries is in conflict with its interpretation of "combat-related operations," the DoD has adequately explained *why* it determined that the operations provision should have a narrower definition.  First, the Court acknowledges Towne's point that the Dictionary includes "training" in one of its definitions of "operations."  However, that definition's source is the JP 3, upon which the DoD relied in its analysis.  The DoD Opinion explains how the DoD looked to the JP 3 in order to determine the definition of "operations," and it excluded the one subset of operations, "Military Engagement, Security Cooperation, and Deterrence," which are not combat-related.  Thus, the DoD concluded that service training "would not qualify because it is neither an operation nor combat-related."  Supp. AR at 26.

Towne claims that this conclusion is flatly contradictory to the DoD's Dictionary, which it is, and the JP 3, which it is not.  The JP 3, as the authoritative source upon which the DoD's analysis rests, says little about training activities. [9]  Thus, DoD was not

---

[9] The Court notes that Towne submitted additional exhibits with her supplemental brief.  One of these, a printout of JP 3, does refer to training as a type of operation.  *See* Plaintiff's Supp. App. at 5.  This reference states that "Operations generally involve military action or the accomplishment of a strategic, operational, or tactical, service, training, or administrative military mission."  *Id.*  This reads as two lists: "strategic,

15

patently incorrect in concluding that training activities do not constitute a "combat-related operation." Even so, the Court reads the DoD's statement as concluding that, if anything, training activities fall under the "Military Engagement" subset of operations, which are clearly not combat-related.

The DoD Opinion next explains that, while the DoD already had a definition for "combat-related disability," it didn't believe that § 1212(c)(1)(A) was intended to encompass that definition. Its reasoning largely mirrors the Court's reasoning above: Congress explicitly delegated authority over "combat-related operations," while it affirmatively defined "combat-related disability." Based on this distinction, the DoD concluded that "combat-related operations" requires "something more" than the standards embodied in 10 U.S.C. § 1413a.

The DoD Opinion goes on to explain that, by aligning the definition of "armed conflict" in DoDI 1332.38 with "combat-related operations," the DoD was explaining that "something more." It is implicit in the DoD Opinion that the DoD believed that the DoDI definition of "armed conflict" covered the remaining operations described in the JP 3.

Towne relies upon *SKF USA Inc. v. United States*, 265 F.3d 1369 (Fed. Cir. 2001), in support of her argument that these two differing constructions necessitate finding that the DoD's construction of "combat-related operations" was arbitrary or capricious. That case dealt with two differing constructions of "foreign like product" used by the Department of Commerce ("Commerce"). *SKF*, however, is distinguishable on one obvious point: the statutory language in that case was *identical*. *See SKF*, 263 F.3d at 1372 (noting that the phrase "foreign like product" appears in the two statutes at issue). Here, "combat-related operations" appears nowhere else in the law. Even so, the Federal Circuit did not find that the two differing constructions were necessarily arbitrary and capricious; instead, it remanded for an explanation of *why* Commerce had applied two differing constructions. *Id.* at 1383.

The Court finds that the DoD's explanation is more than sufficient to explain the DoD's differing regulatory definitions. Even if one disregards the distinction between the statutory terms "combat-related operations" and "combat-related disability," as Towne has, the DoD's explanation is well-reasoned and not at all arbitrary. Thus, while the Court finds that there is in fact no conflict between the DoD's regulatory definitions of the two *complete* terms, the DoD has adequately explained why these two similar terms are defined differently. The DoD has, therefore, overcome the Supreme Court's concern in *Fox* about *unexplained* differences.

---

operational, or tactical," which may be combat-related, and "service, training, or administrative," which are not.

### e. The ABCMR Considered Towne's Arguments

Towne's final argument in her supplemental brief is that the ABCMR failed to adequately explain its reasons for denying her relief after its consideration of the DoD Opinion. Although the ABCMR acknowledged seven arguments presented by Towne,[10] Towne argues that its failure to substantively analyze each argument renders arbitrary and capricious the ABCMR's decision to deny her relief.

The Court cannot agree. As the Court's Opinion makes clear, the ultimate flaws in all of Towne's arguments are that they ignore the plain meaning of the statute and the readily-apparent distinction between "combat-related operations" and the other statutes she points to: "combat-related operations" is not defined via a cross-reference to § 1413a. Instead, Congress expressly delegated interpretive authority to the Secretary of Defense. These points are expressly raised by the ABCMR. *See* Supp. AR at 12-13. Those two points are sufficient to explain why the DoD's construction of the statute was a reasonable exercise of its discretion, and that sufficiency is not negated simply because the ABCMR offered a more detailed rebuttal to one of Towne's arguments.

### f. The DTM Had Expired When the PEB, APDA and ABCMR Made Their Determinations, but Towne Waived This Argument by Failing to Raise it Before Those Entities

As a final point, the Court notes that the Government asserted, in its opening brief, that by failing to raise the issue below, Towne waived her argument that the DTM had expired. This argument arises from Paragraph 16 of Towne's Complaint. While it appears that she abandoned this argument in her supplemental brief, the Court briefly considers it.

In her Complaint, Towne argues that the findings and decisions of the PEB, APDA and ABCMR were invalid because "the DTM was no longer in force or effect in June 2009 when the PEB made its determination regarding Ms. Towne's disability proceeding or when the APDA declined to modify that determination." Compl. at ¶ 16.

The Court concludes that she did, in fact, waive this argument. The facts of this case are very similar to those in *Gramling v. United States*, 2009 WL 4020266, Civ. No. 09-86 (Fed. Cl. 2009) (Merow, J.). There, the plaintiff received similar findings that his disability resulted from a combat-related injury, but that his disability was not the result of combat-related operations. In *Gramling*, the Government moved to dismiss the case based on the assertion that the plaintiff waived certain arguments. Relying on *Metz v. United States*, 466 F.3d 991 (Fed. Cir. 2006), as the Government does here, Judge Merow concluded that the plaintiff's failure to raise an argument below barred that argument at the Court of Federal Claims.

---

[10] These seven arguments are the same arguments that the Court analyzed in Sections III.c. and III.d. of this Opinion.

Towne appears to attempt to salvage this argument by quoting an argument that the "DTM is invalid because it is inconsistent with existing statutory **and regulatory authority**…" Pltf. Mot. at 37 (quoting AR 16) (emphasis in brief). She then claims that this argument "lies squarely within the ambit" of her original challenge before the ABCMR. (Docket No. 11 at 38). Towne's argument relies heavily upon the DoD's combat-related disability regulations, such that the only reasonable reading of that argument below would have been that her reference to "regulatory authority" addressed the DoDI, not the expiration of the DTM. How this unfathomably broad statement was supposed to give the ABCMR any hint of Towne's expiration argument is beyond this Court. Thus, the Court agrees with the Government and *Gramling* in holding that Towne waived her expiration argument by failing to *actually* raise it below.

## IV.  Conclusion

For all of the reasons stated above, the Court concludes that the Army's denial of payment to Towne of enhanced disability severance payments was not arbitrary, capricious or contrary to law or regulation. The Government's motion for judgment on the administrative record is, therefore, GRANTED. Conversely, because Towne has failed to show that the Army's denial was arbitrary, capricious or contrary to law or regulation, her motion for judgment on the administrative record is DENIED. The Clerk is directed to enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

18